UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF TEXAS
HOUSTON, TEXAS

United States Courts
Southern District of Texas
FILED

AUG 1 4 2013

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**ex rel.**<br>MAMIE ANDREWS<br><br>Plaintiffs,<br><br>v.<br><br>EDUCATION AFFILIATES, INC.;<br>MEDVANCE INSTITUTE d/b/a<br>FORTIS COLLEGE; KIMC SOUTHWEST<br>HOUSTON LLC; KIMC INVESTMENTS LP;<br>and KIMC TEXAS HOLDING, LLC<br><br>Defendants. | CASE NO.:<br><br>FILED IN CAMERA AND<br>UNDER SEAL PURSUANT<br>TO 31 U.S.C. § 3730(b)(2)<br><br>**H - 1 3 - 2 3 6 6** |

## COMPLAINT UNDER THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT

1.  This is a *qui tam* action brought by Relator, Mamie Andrews, on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 *et seq* (the "FCA"). Relator's complaint articulates a carefully-crafted, top-down intention for-profit education scheme that Defendants Education Affiliates, Inc., MedVance Institute d/b/a Fortis College, KIMC Southwest Houston, Inc., KIMC Investments, LP and KIMC Texas Holdings, LLC have used to defraud the United States government out of millions of dollars in the form of federally-backed student loans and grants. Defendants' scam is wide-spread, and affects all aspects of a student's experience with the goal of enrolling as many students as possible and retaining them for as long as possible, no matter what the cost to the student. The scheme is

1

implemented with the intent to maximize financial aid dollars from the United States for as long as possible.

2. For-profit colleges, such as the ones owned and operated by Defendants, have clearly borrowed the business model of the predatory lending industry, taking absolutely no risk in signing up students for federally-guaranteed loans. If the students cannot repay their loans, Defendants do not suffer. The incentive for deceptive and illegal practices is undeniable; last year, federal financial aid at for-profit colleges totaled more than $30 billion.

3. As detailed herein, Defendants made, or caused to be made, false statements in order to participate in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq* ("Title IV, HEA programs" or "HEA"). Title IV provides students with financial aid that is backed by the federal government. By way of example, students may receive Pell grants that do not have to be repaid, or Stafford or Perkins loans that carry repayment obligations. Defendants created and implemented their fraudulent scheme to become eligible, and then to continue participation in, federal student financial assistance programs.

4. The FCA provides that any person who submits, or causes to be submitted, a false claim to the government is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. Pursuant to 31 U.S.C. § 3730(b)(2), this complaint must be filed *in camera* and under seal, without service on the defendants. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

5. Pursuant to the Federal False Claims Act, Relator seeks to recover on behalf of the United States any damages and civil penalties arising from Defendants' knowingly false and/or fraudulent certifications of eligibility to the Department of Education ("DOE") through its Title IV, HEA program. From 2009 through the present, Defendants knowingly submitted, or caused to be submitted, claims for payment to the Department of Education based upon false certifications.

## JURISDICTION AND VENUE

6. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

7. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because one or more of Defendants can be found in, resides in, transacts business in and/or has committed acts related to the allegations in this Complaint in the Southern District of Texas.

8. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(c) because one or more of Defendants can be found in, resides in and/or transacts business in the Southern District of Texas, and many of the alleged acts occurred in this District.

9. Relator knows of no other complaints that have been filed against Defendants alleging the same or similar allegations. Relator is an original source as defined by the Federal False Claims Act.

10. Relator has made voluntary disclosures to the United States prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## PARTIES

11. Relator Mamie Andrews is a resident of Spring, Texas. Relator was employed with Fortis College in Houston, Texas from December 19, 2011 through January 3, 2013. Relator worked as an Academic Dean at Fortis College's Houston South campus.

12. Defendant Education Affiliates, Inc. is located at 5024-A Campbell Boulevard in Baltimore, Maryland 21236. It is a privately held corporation "providing career education through a variety of certificate, diploma and degree programs." Education Affiliates controls 50 schools and colleges in 17 states. The change in ownership of MedVance to Education Affiliates occurred on December 15, 2009.

13. Defendant MedVance Institute d/b/a Fortis College is owned and operated by Education Affiliates. The name of the school was changed from MedVance to Fortis College on April 1, 2011.

14. Defendant KIMC Southwest Houston, LLC controls MedVance Institute d/b/a Fortis College.

15. Defendant KIMC Investments LP is the parent company of Medvance Institute d/b/a Fortis College. It was converted from a limited partnership to a corporation in December 2003

16. Defendant KIMC Texas Holding LLC, is a wholly owned subsidiary of Defendant KIMC Investments, Inc.

## REGULATORY OVERVIEW

### The Federal False Claims Act

17. For violations occurring prior to May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1) (1986), provides in pertinent part that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes

to be presented, to an officer or employee of the United States Government. . . [a] false or fraudulent claim for payment or approval."

18. For violations occurring on or after May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.

19. The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (I) is presented to an officer, employee, or agent of the United States; or (II) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . ." 31 U.S.C. § 3729(b)(2)(A) (2009).

20. The false statements provision of the FCA, prior to the FERA amendments, provides that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (1986). As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

21. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## Eligibility for Programs under Title IV of
## The Higher Education Act of 1965

22. Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 et seq, Congress established various student loan and grant programs, including, but not limited to, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively, "Title IV funding") in order to financially assist eligible students in obtaining post-secondary educations.

23. Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV, HEA programs varies, each Title IV, HEA program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

24. In order to become eligible to receive Title IV funding under programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a Program Participation Agreement ("PPA") with the Department of Education. 20 U.S.C. §1094(a); 34 C.F.R. §668.14.

25. Each PPA expressly contains a school's initial and continuing eligibility to receive funds under Title IV, HEA programs depending on its compliance with specific statutory requirements. By executing the PPA, a school agrees that its participation in Title IV, HEA

programs is "subject to the terms and conditions set forth in [the] Agreement." Additionally, the participating school agrees to "comply with the programs' statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV, HEA program in which it participates, as well as . . . the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668."

26. Defendants continuously signed PPAs with the Department of Education from 2009 through the present.

## ALLEGATIONS OF FRAUDULENT CONDUCT

27. Education Affiliates, Inc. and all affiliated businesses named as defendants in this Complaint (hereinafter collectively referred to as "Defendants" or "Fortis") abide by a very simple formula at all of their for-profit schools: enroll as many students as possible, for as long as possible, to maximize financial funding from the government by **any means possible**. Defendants employ a well-trained corps of recruiters who are taught to target vulnerable low-income students desperately seeking to better their lives. These students are enrolled into high-cost educational programs, but are unaware that they have been sold programs based on Defendants' false promises and fraudulent misrepresentations. Students do not realize until too late that the school they want to trust regards them as nothing more than a means to more federally-guaranteed loans and grants.

28. From 2009 through the present, while continuously certifying that it complied with "all legal requirements," Defendants refused to abide by federal regulations, and focused instead on maximizing the "for-profit" title they so richly deserve. Each time Defendants made certifications to the DOE, Defendants were aware that their schools were not in compliance with the mandatory federal regulations controlling their industry, and that they had no intention of

complying if it meant sacrificing profit margins. Defendants' nationwide false claims and certifications have caused, and continue to cause, significant financial harm to the United States of America and its taxpayers.

### Defendants Misrepresented Student Attendance and Used Improper Bait-and-Switch Tactics in Order to Collect Federal Financial Aid to which they were Not Entitled

29. Beginning on Relator's first day at Defendants' school, and continuing through her termination, it was a constant struggle for Relator to attempt to keep Defendants regulated and in compliance with federal law. She witnessed the occurrence of numerous blatantly fraudulent activities, including, but not limited to: faking attendance records, using bait-and-switch tactics to enroll students in unwanted programs, and enrolling ineligible students into Defendants' programs. All of these actions were taken by Defendants to maximize the Title IV funding they received at the government's expense.

30. In order to maximize Title IV funds flowing through their campuses, Defendants engaged in numerous fraudulent practices regarding student attendance. Most egregiously, Defendants routinely forced instructors to mark absent students present, even students who had never set foot on campus.

31. Relator is aware that the President of her campus, Sidney Carey, (who was also the President of three additional campuses) was "very motivated" to keep students on the books so they could continue to draw down federal funding for those students. Defendants' employees were pressured to keep students active on the books for as long as possible, under any circumstances. In a January 10, 2012 email, on of Defendants' employees at the Houston-South campus wrote to Relator:

> "I only gave her attendance because the student had signed in for books and she

had signed in with admissions. In the past [President Sidney Carey] stated that if the student signed in with admissions that they were to be given attendance for that day. I was just going off of what I had been told to do."

32. In January 2012, an internal audit was conducted at Defendants' two Houston campuses. The audit was conducted because those campuses were scheduled for a visit from the Department of Education and the Veterans Administration. During this audit, it was discovered that as many as 60 students were improperly marked as present in the schools' books. Imram Ayub, the Director of Education at Defendants' Houston-North campus was found to be responsible for improperly keeping more than 50 students on the books, and was told by the auditor that he had "committed fraud" by not dropping those students. However, Mr. Ayub claimed he had kept the students enrolled because he was under extreme pressure to meet institutional goals. Mr. Ayub was not disciplined for his actions; rather, he was told to "rectify the problem, but not to do it too zealously." He was told to drop the students, but not to do it all at once.

33. Despite the findings of the internal auditors, Defendants continued to keep students on their books who were not actually attending Defendants' schools. One student was marked as present in class, but in actuality, she was out of the country. Defendants kept students "enrolled" in classes rather than cancelling the students so the schools could continue to collect federal financial aid.

34. The Director of the Medical Assisting program complained that attendance records for his program included students who had never set foot in his classroom. He was terminated.

35. Student attendance records were frequently altered over the objections of instructors at

Defendants' schools. However, Defendants' staff were pressured to keep students on the books. President Sidney Carey offered his staff guidance in this August 8, 2012 email:

> "There were 5 cancels from the last start representing a loss of $77,500 in revenues. This is unacceptable, especially when we have recently laid off 4 employees and reduced 4 employees to part time status and are about to start another round of layoffs if this continues… I do not expect to see any more of this, it is ridiculous that we have so many cancels, each department and department head will be held accountable for any and all cancels."

36. Defendants did whatever was necessary to fill the seats at their schools. Rather than lose a sale when specific courses were not available, Defendants steered students into unnecessary and unwanted programs just to make sure they would not lose the sales. Eventually, the students would be re-enrolled into the classes they wanted in the first place. These bait-and-switch tactics enabled the schools to meet their corporate-governed enrollment quotas, and allowed recruiters to get their bonuses. Essentially, this scam was accomplished by flipping students from monthly programs into quarterly programs. For example, if a prospective student applied to the Vocational Nursing Program—a program scheduled to start the following quarter—Fortis flipped that student into the Medical Assisting program, which had an immediate start date. Students were routinely told that the Medical Assisting program would provide a "solid foundation" for the Nursing Program, and they would get a "head start" on their credits and coursework. In reality, the programs were completely unrelated and none of the credits transferred from program to program. Fortis employed the same scheme with its Sterile Processing Technical program, which began monthly, and its Surgical Processing Technical program, which began quarterly.

This bait-and-switch scheme financially benefitted Fortis, which collected tuition for two separate programs from the same student, all at the expense of the federal government.

37. A January 18, 2012 email from President Sidney Carey to Relator adequately reflects Defendants' attitudes about student enrollment:

> ". . . when a student comes in to enroll, they are as motivated as they will ever be, if they don't start we might never see them again. Life's circumstances and situations take over and their interests diminish, we take them whenever we can get them."

Indeed, Defendants' schools took students whenever and however they could get them, even if that meant using fraudulent and misleading means to achieve their enrollment goals each month. Defendants used tactics that were not only harmful and unfair to students, but caused the United States severe financial harm.

### Defendants Misrepresented Job Placement Statistics to Potential Students in Violation of Federal Regulations

38. In their numerous and continuous certifications to the government, Defendants agreed to comply with all federal regulations, which include the provisions of 34 C.F.R § 668. Defendants caused blatant lies to be told to their potential incoming student population to induce them to enroll. Students cannot make informed decisions about whether they are prepared to handle a higher education course-load, as well as the price tag that comes along with it, if they are being misinformed about Defendants' graduates' job placement statistics. Defendants' misrepresentations regarding their graduates' data and job placement statistics have caused the United States to foot the bill for thousands of students who would not have enrolled but for Defendants' blatant misrepresentations.

39. In the case of an educational institution that advertises job placement rates as a

means of attracting students, the institution will make available to prospective students at or before the time that those students apply for enrollment- (i) the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements, and (ii) Relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students. 34 C.F.R. § 668.14(b)(10).

40. Defendants' recruiters are trained to hype the schools' high job placement rates and potential salaries, as well as the extensive assistance Defendants' schools will provide to graduates seeking employment. Despite the claims of excessive career service assistance at Relator's campus, there was no career placement help or job leads for students. Misrepresentation of job placement assistance to prospective students is a clear violation of 34 C.F.R. § 668.74(b). Defendants **routinely** counted students as "placed" who either did not have jobs or who were working in the jobs they held before attending Defendants' schools. Relator estimates that, at best, Defendants successfully placed approximately 20 percent of their graduates into actual jobs related to the students' courses of study. However, Relator's campus boasted that its nursing programs had **"100 percent placement**," and that the rest of their programs "**had over 80 percent placement**." The President was aware that these assertions were being made by the Director of Placements to potential students on campus tours, but did nothing to stop the blatant lies. Statistics published on Defendants' websites for its numerous campuses tout placement rates above 60 percent, which is also false, misleading information based on Relator's knowledge and experience.

41. Defendants' PPAs requires certification that, if Defendants' schools make

representations about job placement statistics, that the statistics be readily supportable in information available to prospective students. Defendants' purposeful and systemic job placement misrepresentations to their potential students violate this obligation and causes Defendants' certifications to be false. Therefore, every federal student aid application submitted from one of Defendants' schools that purposefully misleads a student about job placement rates constituted a false claim.

### Defendants Manipulated their Graduation Rates

42. The Workforce Investment Act of 1998 is a job training program designed to provide training for jobs in high-growth areas, including nursing. It is directed by the Department of Labor and overseen by the Texas Workforce Commission. To qualify for the program, a school must maintain a specific graduation rate. When Fortis determined that it would be unable to meet the required graduation rate in 2011, it changed its graduation date from August 28 to September 1, which enabled it to push off reporting until the following year. In 2012, it changed graduation dates once again in order to manipulate the nursing graduation rate and qualify for grants that ranged from $6,000 to $7,000 per year per nursing student. The blatant manipulation of these graduation rates constitutes false claims for payment by Defendants.

### Defendants Misled Students about Job Opportunities

43. Defendants' written policies stated that students in their health care programs could not have criminal felony convictions and were required to pass a drug and alcohol test. These rules were ignored, even when prospective students told recruiters of previous problems with the law. Students repeatedly told Relator of their criminal pasts and histories with drugs and alcohol. Three students with felony records learned they were unemployable from state regulators after graduation—these students had been up front about their criminal records with Defendants'

schools during the enrollment process. At least one other student, who disclosed his criminal past to a recruiter, learned he would not be able to find work when he applied for an externship at a hospital.

### Defendants Received Federal Financial Aid as a Result of their False Claims

44. Through their numerous false certifications to the United States, Defendants intentionally made false statements to certify that Defendants' schools were eligible for participation in federal and state student loan and grant programs.

45. Defendants receive millions of dollars in federal funds from several different Title IV, HEA programs. One of those programs is the Pell Grant program, which pays grants directly to schools for the benefit of their students. These grants do not have to be repaid. In addition to Pell Grants, Defendants also receive the proceeds of federally guaranteed student loans. Through these student loans, a qualifying student borrows money from a financial institution, and the amount of money borrowed is guaranteed by a guarantee agency; the guaranty agency guarantees the lender from loss due to a borrower's default. The federal government then reimburses the guaranty agency for all or part of the amount of the default claims the guaranty agency must pay to a lender on the defaulted student loan. Due to Defendants' false certifications, they were able to receive federal funds in the form of Pell Grants and federally guaranteed student loans. In many instances, the United States has been, and will continue to be, forced to repay the federally guaranteed student loans because of student defaults.

46. Relator estimates that financial losses to the government due to Defendants' false certifications and fraudulent conduct are in excess of $25 million.

## COUNT I

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)
### prior to and after the amendments enacted on May 20, 2009

47. Relator realleges and incorporates by reference the allegations of paragraphs 1-46 of this complaint.

48. This count sets forth claims for treble damages, civil penalties and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729-3732.

49. Through the acts described above, Defendants and their agents and employees knowingly caused to be presented false and/or fraudulent claims, records, and statements in order to obtain federal funding for students enrolled at their campuses.

50. Under the Federal False Claims Act, 31 U.S.C. § 3729(a), in effect prior to May 20, 2009, Defendants have violated:

   (a) 31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

   (b) 31 U.S.C. § 3729(a)(2) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government; and/or

   (c) 31 U.S.C. § 3729(a)(3) by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid.

51. Under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1) as amended on May 20, 2009, Defendants have violated:

   (a) 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

(b) 31 U.S.C. § 3729(a)(1)(B) by knowingly making using or causing to be made or used a false record or statement material to a false or fraudulent claim; and/or

(c) 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subparagraph (A) or (B).

52. The United States, unaware of the falsity of the claims, approved, paid, and participated in payments made by the United States for claims that otherwise would not have been allowed.

53. By reason of Defendants' false claims, the United States has been damaged, and possibly continues to be damaged.

## COUNT II
### Violation of the Reverse False Claims Act, 31 U.S.C. § 3729(a) prior to and after the amendments enacted on May 20, 2009

54. Relator realleges and incorporates by reference the allegations of paragraphs 1-46 of this complaint.

55. Through the acts described above, Defendants and their agents and employees intentionally and knowingly failed to report students who should have been dropped from Defendants' schools due to attendance violations and/or faked attendance records in order to "conceal, avoid, or decrease" an obligation by Defendants to return federal funding to the government.

56. Under the False Claims Act, 31 U.S.C. § 3729(a) in effect prior to May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government.

57. Under the False Claims Act, 31 U.S.C. § 3729(a)(1) as amended on May 20,

2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

58. Defendants' fraudulent concealment and intentional failure to report improperly enrolled students in order to avoid refunding federal money in the form of Pell Grants and federally guaranteed student loans constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

59. Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT III
## VIOLATION OF 31 U.S.C. § 3730(h)

60. Relator realleges and incorporates by reference the allegations of paragraphs 1 through 46 as though fully set forth herein.

61. In violation of the False Claims Act § 3730(h), Defendant took negative employment action, including termination of employment, against Relator as a result of lawful actions taken by Relator to stop Defendants' numerous violations of the False Claims Act. Specifically, as soon as Relator became aware of Defendant's fraudulent practices, she shared the information with her superiors, but to no avail. After years of trying to correct Defendants' improper behavior, Relator was ultimately terminated.

62. As a result of Defendant's retaliatory and discriminatory conduct, Relator has suffered damages.

WHEREFORE, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a) Defendants cease and desist from violating the Federal False Claims Act;

b) Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

c) Defendants pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

d) Plaintiff/Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act and 31 U.S.C. § 3730(h);

e) Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses and costs; and

f) The United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury.

Dated this 14th day of August, 2013.

Respectfully submitted,

/s/ Barbara J. Gardner

BARBARA J. GARDNER
Federal ID Number: 922
TBN: 07651300
LAM LYN PHILIP
3555 Timmons Lane, Suite 790
Houston, Texas 77027
Phone: (713) 981-0900
Fax: (713) 772-7085
Barbara@Gardnerforjustice.com

**Local Counsel for Relator**

ELAINE STROMGREN
Florida Bar No.: 0417610
estromgren@jameshoyer.com
JESSE L. HOYER
Florida Bar No.: 076934
jlhoyer@jameshoyer.com
JAMES, HOYER, NEWCOMER &
SMILJANICH, P.A.
4830 West Kennedy Boulevard
Suite 550
Tampa, Florida 33609
Phone: (813) 397-2300
Fax: (813) 397-2310

**Lead Counsel for Relator**